**In re UTILITIES POWER & LIGHT CORPORATION.**

District Court, N. D. Illinois, E. D.
Oct. 27, 1939.

Brewer, Smith & Farrell, of Chicago, Ill., for principal debtor.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., trustee under bond issue of Elkhorn Coal Co.

Defrees, Buckingham, Jones & Hoffman, of Chicago, Ill., for petitioning creditors.

Ross & Watts and Winston, Strawn & Shaw, all of Chicago, Ill., for Associated Gas Corporation.

Melvin Hawley, of Chicago, Ill., for trustee of Utilities Power & Light Corporation.

Chapman & Cutler, of Chicago, Ill., for Preferred Stockholders Committee.

Hinshaw & Culbertson, of Chicago, Ill., for Elkhorn Coal Co., subsidiary debtor.

HOLLY, District Judge.

Various plans of reorganization have been filed herein by the parties in interest and hearings on those plans have been held by the Securities and Exchange Commission and the Special Master appointed by this Court. These hearings were held concurrently in Washington by the Securities and Exchange Commission and Harry N. Gottlieb, the Special Master. Like hearings were also held in Chicago by the Special Master and the Commission. On these hearings care was taken to have the record disclose the respective portions thereof which were to be deemed part of the record in hearings before the Special Master only, that part before the Commission only and the part before both the Special Master and the Commission. The Commission approved the plan of Atlas Corporation filed February 1, 1939, as revised by the amendments of June 30 and July 10, 1939, and the Special Master has approved that plan subject to certain reservations and recommendations made by him.

Utilities Power & Light Corporation is a corporation organized under the laws of the State of Virginia. It is a holding company, its assets consisting solely of securities issued by other corporations. Since the appointment of a trustee in these proceedings its financial condition has been considerably improved.[1] At the present

---

[1] During the year 1936 the control of the Utilities Power & Light Corporation was entirely in the hands of its stockholders. On the 4th day of January, 1937, this court approved the petition filed by the debtor corporation under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, and from that date to this the administration of Utilities Power & Light Corporation has been under the jurisdiction of this court. From the 4th day of January, 1937, until the 3rd of November, 1937, when a Trustee, appointed by this court, took possession, the debtor was in possession of the estate. From the latter date until now the estate has been administered by the court's Trustee. Mr. Willoughby Walling, the first Trustee, died on February 23, 1938. Mr. J. Samuel Hartt then served as temporary Trustee from that date until March 16, 1938, when the present Trustee, Mr. Charles True Adams, was appointed.

Considering the general prevailing opinion that the administration of an estate by a court is expensive and that the appointment of a Trustee adds to the expense (even though both may be necessary to safe-guard the estate) it is interesting to note the figures which show the annual cost of running Utilities Power & Light Corporation for the years 1936, 1937 and 1938, together with an estimate for 1939 based on nine month's figures. It should be remembered that in 1936 the company was run by the duly elected officers and directors of the stockholders. In

time it is solvent. Its assets, as of July 31, 1939, including cash on hand, have a value of approximately $44,000,000, and its outstanding debentures including interest amounted to $36,710,500. Shares of capital stock outstanding at that time were as follows:

7% Preferred (par value $100 per share) ................ $17,817,367.

Class A (par value $1.00 per share) .................. 1,622,127.

Class B (par value $1.00 per share) .................. 1,128,386.

Common (par value $1.00 per share) .................. 2,166,084.

At that date the arrearages on dividends on the preferred stock amounted to $8,210,386.

In the plan of Atlas of February 1, 1939, as revised and amended it is provided that all the assets of the Debtor shall promptly be vested in a new company to be formed for the purpose under the laws of the State of Delaware which shall issue new securities of the nature and extent hereinafter set forth. All claims prior in rank to the debentures above mentioned are to be paid in cash in full both as to principal and interest. Holders of said debentures and of claims which shall be determined in the reorganization proceedings to be entitled in rank equal to the

old debenture will receive for each $1,000 in principal amount thereof.

(1) $400 principal amount of debentures to be issued by the new company, less the amount of cash, if any, received by the holder of each such $1,000 debenture under certain other provisions of the plan not necessary to be noted here.

(2) 6 shares of preferred stock of the principal value of $50 per share to be issued by the new company.

(3) 50 shares of common stock of the par value of $4 per share to be issued by the new company plus one share of the new common stock for each $6 of interest on the old debenture accrued up to the date from which interest on the new debenture begins to accrue.

Holders of 7% cumulative preferred stock of the Debtor will receive for each share of said preferred stock 5 shares of new common stock. The plan further recites that since there is no equity in the property of the Debtor above the old debentures (and claims prior in rank and on a parity therewith) and the Old Preferred stock, applicable to holders of Class A stock, Class B stock and common stock of the Debtor and since said classes of stock have no value, the holders of such Class A stock, Class B stock and the old common stock shall not participate in the reorgani-

---

1937 it was still run by the officers and directors elected by the stockholders but under the jurisdiction of the court and during the years of 1938 and 1939 has been administered by a Trustee under the jurisdiction of this court. The cost of operation for the years 1936 to 1939, both inclusive, is as follows:

| 1936 | 1937 | 1938 | (Trustee's Estimate for 1939) |
|---|---|---|---|
| $609,978.50 | $586,172.84 | $371,155.46 | $340,000 (Based on figures for 9 months) |

The 1938 figure and estimated 1939 figure contain *not only operating cost* but payments on account to the Trustee and his attorneys, and payments in full to his engineer, witnesses, etc. After deducting non-recurring items such as these fees, the expense of the Securities and Exchange Commission and court hearings and other matters having to do with reorganization and not with usual operating expense, the Trustee estimates that the company can now continue to operate, after reorganization, at an annual expense of less than $200,000. In

passing, it should be said that this large saving in the cost of operation has been accomplished without sacrifice of earnings.

It is also worth pointing out that on December 31, 1937, the assets and liabilities were approximately the same. If the assets had stayed at the same value as they were on December 31, 1937, and nothing had been done by the Trustee in regard to the liabilities of the estate prior to the approval of a plan, the estate would now be definitely insolvent due to the accumulation of interest on that debt at a rate which exceeded the company's earnings. Due, however, to the administration of the estate by the Trustee under the jurisdiction of this court, the ratio of the assets to the liabilities has been so improved that an equity of many millions of dollars has been created.

In order to give a complete picture of the operation of this estate while under the jurisdiction of this court, I have requested the Trustee to prepare and file a report covering these operations on or before the 15th day of November, 1939.

zation, shall not receive any securities to be issued by the new company and the acceptance of the plan by said holders shall not be requisite to confirmation of the plan.

For the purpose of this memorandum it is not necessary to notice any of the other provisions of the plan except one which will be noted later.

Representatives of the holders of Class A, Class B and the common stock are objecting to the plan and have filed objections to the report of the Special Master.

Upon the hearing of the objections to the plan the case for the objectors was argued under four heads, (1) that a plan of reorganization of a solvent corporation which eliminates three classes of shareholders is not authorized by the Bankruptcy Act, (2) if the Act did authorize such a plan the Act would be unconstitutional, (3) that there are two approaches to reorganization, the absolute priority approach and the relative priority approach, that the Atlas plan proceeds on the absolute priority theory while the courts of this Circuit proceed on the relative priority theory, and (4) that the testimony of the expert witnesses as to the intrinsic value of the property of the Debtor, while entitled to some weight, is not a safe basis for a reorganization such as is proposed in this case.

First: Does Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, authorize in the case of a solvent corporation, a plan of reorganization which eliminates one or more classes of stockholders: Counsel called the court's attention particularly to subdivisions (e) (1) and (b) (4) of said section.[2] As I read those clauses they provide that a plan of reorganization may be confirmed without submission to or acceptance by a class or classes of stockholders if the plan provides adequate protection for the realization by the holders of such class or classes of stock of the value of their equity, if any, in the property of the debtor dealt with by the plan, by appraisal and payment in cash of the value of their stock. Here the plan does not provide for a formal appraisal of the value of the stock, but the Securities and Exchange Commission and the Special Master did hear evidence of highly skilled and expert witnesses as to the value of the properties of the debtor. The Special Master and the Commission found the value of the property to be less than the amount of the debentures, plus interest, and the preferred stock plus the arrearages of dividends. Unless, therefore, the Special Master and the Commission were in error in so finding the holders of Class A, Class B and common stock had no equity in the property of the Debtor,

[2] Subdivision (e) (1) reads as follows: "A plan of reorganization shall not be confirmed until it has been accepted in writing, whether before or after the filing of the petition or answer under this section, and such acceptance shall have been filed in the proceeding by or on behalf of creditors holding two thirds in amount of the claims of each class whose claims have been allowed and would be affected by the plan and by or on behalf of stockholders of the debtor holding a majority of the stock of each class: Provided, however, That such acceptance shall not be requisite to the confirmation of the plan by any creditor or class of creditors (a) whose claims are not affected by the plan, or (b) if the plan makes provision for the payment of their claims in cash in full, or (c) if provision is made in the plan for the protection of the interests, claims, or liens of such creditor or class of creditors in the manner provided in subdivision (b), clause (5), of this section: And provided further, That such acceptance shall not be requisite to the confirmation of the plan by any stockholder or class of stockholders (1) if the judge shall have determined either that the debtor is insolvent, or that the interests of such stockholder or stockholders will not be affected by the plan, or (2) if provision is made in the plan for the protection of the interests of such stockholder or class of stockholders in the manner provided in subdivision (b), clause (4), of this section."

Subdivision (b) (4) reads as follows: "A plan of reorganization * * * shall provide in respect of each class of stockholders, of which less than a majority shall accept such plan (unless the judge shall determine either that the debtor is insolvent, or that the interest of such class of stockholders will not be affected adversely by the plan), adequate protection for the realization by them of the value of their equity, if any, in the property of the debtor dealt with by the plan, either, as provided in the plan, (a) by a sale of the property at not less than a fair upset price, or (b) by appraisal and payment in cash of the value either of their stock, or at the objecting stockholders' election, of the securities allotted to such stockholders under the plan, if any shall be so allotted, or (c) by such methods as will do substantial justice to such stockholders under and consistent with the circumstances of the particular case."

it was not necessary in the plan to make provision for them nor was their acceptance of the plan necessary. Whether the testimony as to value justified the findings of the Special Master and the Commission I will discuss later.

■ Second: May Congress, under the power given it to establish "uniform laws on the subject of bankruptcies throughout the United States", authorize a court of bankruptcy, in a reorganization proceeding, to eliminate classes of stockholders of a solvent corporation?

Our Supreme Court in Continental Illinois National Bank & Trust Company v. Chicago Rock Island & Pacific Railway Company, 294 U.S. 648, 55 S.Ct. 595, 604, 79 L.Ed. 1110, held that the term bankruptcies as used in, the Constitution (U.S.C.A. Const. art. 1, § 8; cl. 4) should "extend to cases where the corporation is 'unable to meet its debts as they mature' " and that it follows, "that section 77 [11 U.S.C.A. § 205], in its general scope and aim, is within the power conferred by the bankruptcy clause of the Constitution." It is true, as counsel asserts, this was dictum; but it was not a mere observation thrown off in a consideration of the subject matter of the case, nor mere illustration or argument. The court very carefully considered the question of the constitutionality of Section 77 and reached the conclusion that the term bankruptcy covered cases where a debtor was not able to meet his debts when they matured, though not insolvent.

Section 77, so held to be a valid exercise of Congressional power, "in its general scope and aim" was quite similar generally to section 77B thereafter enacted. Section 77B, therefore, "in its general scope and aim" must be held to be within the power given to Congress by the Constitution.

■ Counsel contend, and it must be admitted, that however the scope of the term bankruptcy may be extended it cannot be extended beyond a debtor-creditor relationship. Here the court found on the petition of the debtor that it could not then pay its debts as they matured. No appeal was taken from that decision. The parties may not again raise that question in this proceeding. A creditor debtor relationship, therefore, exists in this case. The question then is, a debtor-creditor relationship existing, may the court in this proceeding, confirm a plan, equitable and feasible in other respects, which eliminates a class or classes of stockholders who clearly have no equity in the property of the corporation?

Counsel for the objecting stockholders cite an article by Judge Kaplan, published in the American Bar Association Journal in 1935, in which he was considering the constitutionality of Section 77B. 21 A. B. A. Journal, 49. In that article Judge Kaplan, speaking of the provisions authorizing the court to compel a minority stockholder to submit to a plan of reorganization which such stockholder considered injurious to his interests, said: "It would seem that the statute goes to the extent of such coercion. Assuming that it does, it is nevertheless still true that the essential nature of the statute as a proceeding in bankruptcy is not changed by such provisions. *They are merely incidental to and in aid of the ultimate and principal purposes of the statute.* It must be remembered that *the proceedings are in any event confined to corporations who are unable to pay their debts,* either because their liabilities exceed their assets or because the nature of the assets and liabilities is such that the liabilities cannot be met as they mature." (Emphasis mine.)

Counsel for objecting stockholders cite also Campbell v. Alleghany Corporation, 4 Cir., 75 F.2d 947, 954, quoting from Judge Parker's opinion as·follows: "While.the constitutionality of the act in so far as it affects the rights of stockholders would not seem to be here involved, still, as the question of the effect of the act on stockholders has been raised in a number of articles as bearing upon its constitutionality, we have considered that question and find nothing in the provisions of the act relating to stockholders which renders it unconstitutional. If a corporation be insolvent in the bankruptcy sense, i. e. if its liabilities exceed its assets, the rights of stockholders are not affected by the reorganization. If, however, it is insolvent only in the sense that it is unable to pay its debts as they mature, the stockholders are benefited and not injured by the adoption of a plan of reorganization which prevents the sacrifice at forced sales of the property upon which the value of their stock depends. Any plan must be accepted by the holders .of a majority of the stock affected as well as approved by the court, or, if the consent of the majority be not obtained, *their equity must be fully protected by the court* in one of the methods prescribed in the Act." (Emphasis mine.)

Judge Parker in this opinion does not say that stockholders who have no real interest in the property may not be eliminated. He says only what the act says, that the equity, *if any,* of the dissenting stockholder must be protected.

It was contended, on the argument, that in a case where, as here, it would be possible, to protect the rights of creditors and the preferred stockholders by modifying the capital structure of the present corporation and giving preferred stock to the present debenture holders, second preferred to the holders of the present preferred and other subordinate classes of stock to the holders of the A, B and common stocks, that this court is not authorized, the corporation being solvent, and could not be authorized under a bankruptcy act, to eliminate the classes of stock below the preferred.

 I cannot agree. The debtor having come into court asserting that it is unable to pay its debts as they mature, the creditors are entitled to a reorganization that, in their sound judgment, promises best to enable the debtor or the new company to meet its obligations. If, in their sound judgment, it appears unwise that the reorganized or new corporation shall carry a complicated stock structure, representing, as to a large portion of the stock, no value whatever, their judgment should prevail. The plan must, of course, be equitable and all classes of stockholders must be dealt with fairly. If the corporation is insolvent but there appears to be a reasonable probability of an appreciation of the value of the assets, the stockholders should be given an interest, properly subordinated to the rights of creditors. If the corporation is solvent, but without a present equity for common stock, though with an equity for the preferred, and there is a reasonable probability of an appreciation of the value of the assets, the common stock should be given an interest properly subordinated. But where, as here, it appears certain that the holders of the A, B and common stock have not the slightest equity in the assets of the debtor, nor will the earnings ever be sufficient to permit participation therein by the holders of the common stock, the plan need make no provision for such classes of stockholders.

In but one other case, In re National Food Products Corporation, D.C., 23 F. Supp. 979, has this question been directly passed upon. Counsel for objecting stockholders suggests that what Judge Chesnut has said in his opinion in that case is dictum, that the National Food Products Corporation was insolvent and therefore the question we have here was not properly before Judge Chesnut. I do not agree. Judge Chesnut found that the debtor was *substantially* insolvent unless some satisfactory plan of reorganization was consummated, because the alternative was a forced sale which would result in wiping out the equity of certain preferred stock. He then went on to discuss the rights of the B stockholders if the corporation should be considered solvent and held that the plan of reorganization which gave nothing to the B stockholders and was not accepted by a majority of such B stockholders should be confirmed because it appeared that these stockholders had no equity in the assets of the corporation, though there was a small equity for the A stockholders. The case at bar is quite similar. Here, in my opinion, were there a forced sale it is quite likely the equity of the preferred stockholders, recognized in the proposed plan, would be wiped out.

 I am of the opinion that Congress may authorize, and by the provisions of Section 77B, 11 U.S.C.A. § 207, has authorized, a court of bankruptcy, in a reorganization proceeding, to eliminate classes of stockholders having no equity, though the corporation may be solvent.

 Third: Counsel says there are two approaches to reorganization, the absolute priority and the relative priority approach; that the Atlas plan proceeds on the absolute priority theory, while the courts of this circuit proceed on the relative priority theory.

While the expressions "absolute" and "relative" priorities have been used by some courts and text writers, I do not believe a bankruptcy court is authorized in a bankruptcy proceeding, to do anything else than follow the priorities that would be followed in any other proceeding. A creditor has the first call on the assets of the debtor, a secured creditor must be preferred to an unsecured creditor in the distribution of the property or the proceeds of the property on which the secured creditor has a lien. On any distribution of the assets of a corporation having issued both preferred and common stock, if the assets are insufficient to satisfy the rights of the preferred stockholders, the common stockholders may not participate in the distribution. These are property rights which may

not be disturbed even in bankruptcy. "The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment [U.S.C.A.Const.] ". Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593, 97 A.L.R. 1106. It is true that many courts, including this court (In re Georgian Hotel Corporation, 7 Cir., 82 F.2d 917), have allowed insolvent debtors in reorganization proceedings to retain a small interest in the corporate assets. Rather than a "relative priority approach" this has been a pragmatic approach. In each of these cases a very large majority of the creditors, in many of the cases nearly 100%, have consented to and urged the adoption of the plan. In most of them the debtor has given up something having at least a "nuisance" value, and approval of the plan seemed on the whole, better for the creditors. But since In re 620 Church Street Bldg. Corporation, 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16, it would appear that an insolvent debtor may not be permitted to participate in the distribution of the assets in a reorganization proceeding over the objection of a single creditor. In Price v. Spokane Silver & Lead Co., 8 Cir., 97 F.2d 237, 245, the court said: "Unless the property of the debtor exceeded in value the amount of the claims of creditors, the stockholders had no interest to protect or preserve." So here unless the property of the debtor exceeded in value the amount of the claims of creditors and preferred stockholders (using the term claims in a broader sense than debts simply), the stockholders had no interest to protect or preserve.

The fact that the holder of the debentures may have purchased them at less than par does not affect his right to priority. Security-First National Bank v. Rindge Land & Nav. Co., 9 Cir., 85 F.2d 557, 107 A.L.R. 1240; Texas Hotel Securities Corp. v. Waco Development Co., 5 Cir., 87 F.2d 395; In re Radio-Keith Orpheum Corp., 2 Cir., 106 F.2d 22.

Fourth: So far I have been assuming, and my holdings have been based upon the assumption, that the value of the assets of the debtor as found by the Securities and Exchange Commission and the Special Master is fair and should be sustained. That finding is assailed by counsel for the objecting stockholders.

The findings of the Commission and the Special Master were based upon the evidence given by three witnesses, Mr. Jay Samuel Hartt, produced by the Trustee, an experienced engineer whose qualifications and disinterestedness no one has questioned, H. Leland Lowe of Stone & Webster Engineering Corporation, one of the outstanding engineering companies of the country, produced by Atlas Corporation, and M. L. Sindeband, an independent engineer, called by the Preferred Stockholders' Committee. Mr. Hartt's valuation of the assets of the corporation, exclusive of cash and certain deferred charges, was $39,744,618. In arriving at that figure he took into consideration many things, the value of the physical property as shown by the books, reproduction cost new, less depreciation, capitalization of reasonably expected gross income from subsidiaries and general economic factors. Counsel complain that Hartt's figures represented his judgment as to the "intrinsic" value rather than the "fair market" value. But Hartt's method of determining value seems to be the proper method in a reorganization proceeding. Whether the properties are to be kept together or are to be, in part, disposed of in changing the new company from a holding company to an investment company, Hartt's method of valuation seems to me the one that will most nearly approximate the real value the properties will have for the holders of the securities of the new company.

Counsel suggests that there are hundreds of factors effecting the reasonably anticipated gross earnings of the property. There are, but none that gives any assurance of earnings that would give an equity in the property to the holders of the A, B or common stocks. It is possible, of course, as suggested by counsel, that as a result of the war now in progress we shall experience a "boom" in business with greatly increased earnings for the subsidiaries of the debtor. But if a "boom" comes for a short period, a depression will likely follow which will more than wipe out all those earnings and lead to a great depreciation in value of the debtor's holdings. In determining values, neither the expert witnesses nor the court should find a speculative value based upon possibilities of "booms" or depressions. A sound judgment as to future probable earnings of a utility, a consideration of the "prudent investment" or cost of production or reproduction, less depreciation, upon which commissions will base rates and general

economic factors should be and it seems to me were taken into consideration by Mr. Hartt. Mr. Lowe of Stone & Webster found a lower value than did Mr. Hartt. Mr. Sindeband increased the value by about $7,000,000, but his estimate falls $10,000,000 short of the value necessary to care for the rights of the debenture holders and Preferred stockholders.

Associated Investing Corporation called two witnesses, Frank H. Golding and George N. Knutson, but their testimony was highly speculative and based upon certain uses of the cash funds of the debtor, but the Commission and the court afterwards approved the use of the fund for other purposes. None of the parties has referred in the argument to the testimony of those witnesses.

 The findings of the Commission and the Master as to the value of the property of the debtor will be sustained.

I may add that it is with great reluctance that I have come to these conclusions. I have received a great number of very pathetic letters from men and women who had invested all, or a considerable part, of their life savings in the A stock of this Company. But I can only follow the law as I find it. It may seem hard to prefer debenture holders who purchased their securities below par to the men and women who invested at par in what they considered a sound non-speculative security. But a District Judge may not do what he considers "fire-side equity". He is bound by the rules of law as he finds them. Furthermore, the injustice from which these investors are suffering is not the work of the sponsors of the plan, nor the court nor the Commission which approves it, but the promoters who issued and marketed the stock.

The Special Master has disapproved of that feature of the plan which provides that the reorganized company, or the new company to which its assets may be transferred, shall be converted into an investment company as distinguished from a public utility holding company. The Special Master in his report states that counsel for the proponents of the plan in briefs submitted to him took the position that the purpose of including provisions for the proposed conversion in the plan as an integral part thereof was to give the question the status of res adjudicata. Counsel have not taken that position in the argument before the court, but on the contrary, disavow any purpose of having the judgment of the court confirming the plan taken as an adjudication that the reorganized or new company must be converted into an investment company. The purpose, they say, of inserting these provisions in the plan was that the interested parties may know such is the purpose of the proponents who will be in control of the new company. This statement, it seems to me, removes the objection raised by the Master. It is true that the directors of the new or reorganized company who will be selected by Atlas Corporation would, without a vote of the stockholders, have the power to so convert the company, though no such purpose was stated in the plan. If it should hereafter be considered unwise to make the conversion, the provisions of the plan would not, in my judgment, make the change compulsory.

 During the course of the argument counsel for the objectors called attention to the fact that on August 5, 1937, when the court was considering whether a trustee should be appointed Mr. Floyd Odlum, speaking as he said for Atlas Corporation, in a letter which was read into the record on that hearing, agreed that if the debtor would use $10,000,000 of the $26,000,000 working capital it had on hand to retire debentures at the lowest price obtainable on competitive tenders, after published notice, and would offer the right to all outstanding debentures to convert such debentures into common stock on the basis of 24 shares for each $100 of the 5% issue and 25 shares for each $100 of the 5½% issue, the Atlas Corporation would guarantee that $20,000,000 of the debentures would either be retired or converted into common stock. That offer, however, was conditioned and one of the conditions was that it would "lapse by its terms if an order appointing a temporary or permanent trustee for the Utilities Power & Light Corporation shall be entered and shall not be promptly stayed pending final action hereunder".

Continuing, counsel for the objecting stockholders say: "It is a far cry from that plan which gave the A, B and common stockholders 2,400,000 shares of common stock to the present Atlas Plan which gives the A, B and common stockholders nothing. You will recall that we then urged upon your Honor the acceptance of Mr. Odlum's proposal. We suggested to your Honor the acceptance of Mr. Odlum's

proposal. We suggested to your Honor that it seemed to give the stockholders a $10,000,000. advantage, but that your Honor, by a scratch of the pen, could wipe out that advantage by an order appointing a trustee."

Putting the letter into the record I then considered, and still consider, an impertinence. If the A, B and Common stockholders had a real equity they were entitled to that equity whether or not a trustee was appointed. I could not imagine Atlas Corporation was willing to donate $10,000,000 to persons who had no equity in the corporation. Whether a trustee should be appointed was a judicial question for the court to determine, uninfluenced by a willingness of Atlas Corporation to make a donation to certain stockholders. There were then warring groups struggling for control and with conflicting interests. The court could not help but feel that if one interest was willing to give "a $10,000,000 advantage" to a certain group of stockholders on condition that the court could be influenced to refrain from appointing a disinterested trustee, it must be that it expected to gain more than that amount through control of the debtor. There were also the interests of the preferred stockholders to be considered. Could the plan suggested by Atlas be carried into effect without prejudice to the preferred stockholders? This court does not see that it would.

Further, if this offer was not more than a passing impulse (and the letter did not show that the offer had been acted upon by the board of directors of Atlas or could have been enforced against that corporation) there was nothing to prevent its consummation. The condition was that an order appointing a trustee should not be entered, or if entered should not be promptly stayed pending final action under the letter. The order was entered but it was promptly stayed. The trustee did not take possession of the property until October 28, 1937. Then appeals taken from the order appointing the trustee were dismissed by appellants, all parties agreed that a trustee was necessary and a new order appointing the trustee was entered by common consent.

█ I am of the opinion that the plan proposed by Atlas Corporation filed February 1, 1939, as revised by the amendments of June 30 and July 10, 1939, is fair, equitable and feasible, and if accepted by the requisite number of holders of debentures and preferred stock should be approved. An order accordingly will be entered October 27, 1939.